# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PATRICK FORKWA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 15-1952-RMC |
| | ) | |
| SYMBRAL FOUNDATION FOR COMMUNITY SERVICES, INC. | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Patrick Forkwa worked as an aide at a longterm care facility operated by the Symbral Foundation for Community Services, Inc., where he alleges that he suffered discrimination due to his sex and was retaliated against after he complained. After full discovery, Symbral moves for summary judgment in its favor, which the Court will grant for the reasons stated below.

## I. FACTS

The facts in this matter originate from multiple sources. First, of course, is the Complaint, which was drafted by Mr. Forkwa with the advice of unidentified counsel.[1] Second, the Court reviews the discovery material and exhibits submitted by the parties through their

---

[1]  Compl. [Dkt. 1]; *see also* Forkwa Dep. [Dkt. 18-2] at 28:1-4 ("I just say I got some advice . . . [f]rom a counsel," who was not identified despite questioning).

respective motions, which include affidavits and Mr. Forkwa's own deposition testimony.[2]  The

Court notes that, in its motion, Symbral rests on a defense of law and not disputes of fact.[3]

Mr. Forkwa, a native of Cameroon, came to the United States in 2005.  Forkwa

Dep. at 38:15-18.  He began to work for Symbral in 2008.  Forkwa Decl. [Dkt. 18-1] ¶ 2.

Symbral provides housing and daily assistance to persons with significant mental disabilities,

providing care in a number of different residences throughout the greater D.C. area.  Def.'s

Statement of Undisputed Facts (Def.'s SOF) [Dkt. 17-1] ¶ 1.  Mr. Forkwa worked as a Relief

Counselor, providing assistance, doing light housekeeping, making meals, and serving as a

companion to Symbral's residents.  Forkwa Decl. ¶ 2.

In 2011, Mr. Forkwa worked in Symbral's "Benjee House" which housed two

residents.  Def.'s SOF ¶ 4.  Mr. Forkwa was supervised there by House Manager Henry Glay, his

immediate supervisor, and by Kendel Larose Paul,[4] Resident Manager, who was Mr. Forkwa's

second-line supervisor.  Larose Aff. [Dkt. 24-1] ¶ 2.  Leon Mohammed was Symbral's Chief

Operating Officer and, in 2011, acting Personnel Director.  Mohammad Decl. [Dkt. 24] ¶ 2.  Mr.

Forkwa understood that Mr. Mohammed was the ranking official.  Forkwa Decl. ¶ 3.  Mr.

Forkwa also worked as a part-time substitute teacher, on an on-call basis, with Montgomery

County Public Schools (MCPS).  Def.'s SOF ¶ 5; Forkwa Dep. 68:14-69:1.

---

[2]   The Court advises that summary judgment is not the occasion for resolving factual differences
between a plaintiff and his own lawyer.

[3] Mr. Forkwa filed a "Motion/Advisory for Forkwa's Response to Defendant's Motion for
Summary Judgment" [Dkt. 19], in which he alleges that Symbral failed to produce records it
obtained through a Freedom of Information Act request.  Mr. Forkwa is a civil plaintiff, not a
criminal defendant, and Symbral is under no obligation to produce information aside from those
disclosures required under the Federal Rules of Civil Procedure or requested by Mr. Forkwa in
discovery.  Mr. Forkwa identifies no discovery request to which Symbral's FOIA material would
be responsive.  Accordingly, his motion will be denied.

[4] Mr. Larose has since changed his name to Kendal Paul, but will be referred to herein as Larose
to maintain consistency with most documents in this matter.

### A. Events of May-June 2011

On May 26, 2011, Mr. Forkwa was scheduled to work his normal shift between 4:00 and11:00 P.M. at Benjee House.  Def.'s SOF ¶ 6.  His coworker, Bih Mbanwi, was scheduled to relieve him at 11:00 p.m.  *Id*.  During the evening shift change, Ms. Mbanwi could not locate her own key to the Benjee House medicine cabinet, and Ms. Mbanwi and Mr. Forkwa argued over whether Mr. Forkwa was obligated to give Ms. Mbanwi his key.  *Id*. ¶ 7.   After that argument occurred—which is not disputed—the chain of events becomes murky; it appears that Mr. Forkwa may have initially refused to give Ms. Mbanwi his key, but relented after talking with Mr. Glay by phone.  Forkwa Dep. 87:13-88:12.  However, at that point Ms. Mbanwi refused to accept his key.  *See* Def.'s SOF ¶ 10.  Based on Mr. Forkwa's deposition testimony and the documentation submitted by the parties, apparently Mr. Forkwa left Benjee House without giving Ms. Mbanwi his key, although after having offered it to her.  *See* Forkwa Dep. 88:12-89:10; Mbanwi Disciplinary Notice [Dkt. 17-5].

A few hours later, in the early morning hours of May 27, 2011, one of the residents living in Benjee House, A.M., passed away.  Def.'s SOF ¶ 11.  Mr. Glay placed both Mr. Forkwa and Ms. Mbanwi, who had been the last caregivers to A.M., on administrative leave without pay (LWOP) while Symbral investigated his death.  *See* Larose Decl. ¶ 6; Glay Decl. [Dkt. 17-6] ¶ 4.

On June 6, 2011, Mr. Larose met with Ms. Mbanwi and provisionally reinstated her to work, warning her that she could still be discharged after investigation.  Larose Decl. ¶ 8.  On June 22, Mr. Larose met with Ms. Mbanwi again and terminated her employment. *Id*. ¶ 8.  A few days later, Ms. Mbanwi met with Mr. Mohammad, to whom she had appealed her discharge.

Mr. Mohammad reinstated Ms. Mbanwi, although Mr. Larose did not learn of this for several weeks. *Id.* ¶ 9; Mohammad Decl. ¶ 4.

Mr. Forkwa was not provisionally reinstated in the same manner as Ms. Mbanwi; he remained on unpaid administrative leave from May 27, 2011 until his full reinstatement on June 22, 2011. Forkwa Decl. ¶ 5. Symbral states that this timing was due to scheduling conflicts between Messrs. Gray, Larose and Forkwa. Records from Montgomery County schools show that Mr. Forkwa worked as a substitute teacher, often for an entire school day, until June 11, 2011. *See* Def.'s SOF ¶ 19. No records indicate what efforts Symbral undertook to meet with Mr. Forkwa prior to June 22. *Id.* ¶ 9.

At an unspecified time during this period, Mr. Forkwa contacted Mr. Glay to complain that he remained on LWOP while female staff were working. Forkwa Dep. at 117:3-13. Mr. Forkwa alleges that he complained to Mr. Glay that he was being discriminated against, to which Mr. Glay allegedly responded that Mr. Glay "sympathizes with women." *Id.* at 90:1-9.[5] Mr. Glay also told Mr. Forkwa during this period, possibly during the same conversation, that he "sympathize[d] with [Mr. Forkwa]" due to the death of A.M., for whom Mr. Forkwa had cared. *Id.* at 113:21-114:5. Ultimately, Mr. Forkwa alleges that he complained to Mr. Glay, Mr. Larose, and Mr. Mohammad of sex discrimination because he remained on LWOP. *See* Forkwa Decl. ¶ 4. On June 22, Mr. Glay met with Mr. Forkwa and gave him a disciplinary action notice that turned his period of LWOP into a disciplinary suspension. Def.'s SOF ¶ 22. The notice said that Mr. Forkwa was being suspended for the period between May 27 and June 22, 2011 for "declin[ing] to follow manager instruction;" "fail[ing] to communicate" and several other

---

[5] Mr. Glay denies making these statements. Glay Decl. ¶ 5.

infractions. Forkwa 6/22/2011 Disciplinary Notice [Dkt. 17-5]. Mr. Forkwa returned to work immediately.

Mr. Forkwa was also given a disciplinary notice in July 2011 for failure to turn in his time cards on time. Forkwa 7/12/2011 Disciplinary Notice [Dkt. 18-4]. He did not identify this discipline as either discriminatory or retaliatory until his opposition brief, *see* Pl.'s Opp'n [Dkt. 18] (Opp'n) ¶ 6, which is too late to be considered. *See Williams v. Spencer*, 883 F. Supp. 2d 165, 181 n.8 (D.D.C. 2012) ("Where the . . . complaint does not make a claim, plaintiff cannot add a new claim through an opposition brief.").

**B. Events of October 2011**

On October 27 in the same year, Symbral conducted a mandatory training session for its counselors at the Shepherd Library starting at 10:00 A.M. Compl. ¶ 11. Afterwards, a controversy ensued as to whether Mr. Forkwa had left this training early without leave or was released. Mr. Forkwa swears that he only left after Mr. Larose announced that individuals with medication licenses, which he possessed, could leave. Forkwa Decl. ¶ 9. Mr. Forkwa submits the Declaration of Kalin-Samlan Commelle, who attests that those with medication licenses were released about noon. *See* Commelle Decl. [Dkt. 18-6] ¶ 3. At one point during the training, perhaps after a break, Mr. Larose asked Mr. Glay to gather his staff into the meeting area. Glay Aff. ¶ 6. Learning from Mr. Glay that Mr. Forkwa was no longer at the Library, and believing that Mr. Forkwa had either not attended the mandatory training or had left early without permission, Mr. Larose met with Mr. Forkwa the next day, October 28, to discuss his non-attendance or early departure. Larose Decl. ¶ 12-13. Mr. Forkwa reminded Mr. Larose that he was at the training at the beginning—when he helped Mr. Larose to distribute materials—but Mr.

Larose remained unconvinced that Mr. Forkwa had not left early without permission.[6]  Mr.

Forkwa states that Mr. Larose told him not to report to work.  Forkwa Decl. ¶ 10.  Mr. Forkwa

then complained that certain female counselors did not attend the training session but were not

being punished or left off the schedule.  *Id.*

The parties disagree about the precise sequence of events that followed, but agree

generally as to the following:  after his conversation with Mr. Larose, Mr. Forkwa called Mr.

Mohammad to complain about not being allowed to work.  *Id.* ¶ 11.  After leaving several voice

messages over the next few days, Mr. Forkwa reached Mr. Mohammad by phone and

complained that he was being discriminated against.  *Id.* ¶ 12.  Mr. Mohammad met with Mr.

Forkwa soon after to discuss his status and complaint.  Mohammad Decl. ¶ 5.  Sometime after

that meeting—the exact date is contested—Mr. Mohammed told Mr. Forkwa that he could return

to work at a different Symbral residence, called "Harmony House."  Forkwa Decl. ¶¶ 12-13.  Mr.

Forkwa does not appear to have had an objection to this transfer and may have sought it.  *See id.*

¶¶ 13-15; Def.'s SOF ¶ 29.

However, Mr. Forkway says that he called but never heard back from Edith Glay,

first-line supervisor of Harmony House (and wife of Mr. Glay), in his effort to make

arrangements to work there.  Forkwa Decl. ¶ 15.  When he called again and reached Ms. Glay,

Mr. Forkwa was told that the position been filled by another Symbral employee.  *Id.*  In contrast,

Ms. Glay states that she spoke with Mr. Forkwa directly and arranged for him to arrive at

Harmony House on a date and time certain for a training session.  Edith Glay Decl. [Dkt. 17-10]

---

[6]  Mr. Forkwa admits that he left Shepherd Library before the end of the training session but
insists that he was excused.  The Court gives the benefit of the disputed fact to Mr. Forkwa but
does not find it necessary to resolve the issue.  As discussed below, the point becomes irrelevant
because Mr. Larose's directions to not report for work were subject to appeal to Mr. Mohammed.

¶ 6. She further states that Mr. Forkwa had called to say that he was lost and that she gave him directions to Harmony House. *Id.* When Mr. Forkwa failed to arrive as scheduled, Ms. Glay informed Mr. Mohammed that he was a no-show. *Id.* ¶ 6-7. Ms. Glay and Mr. Mohammed both aver that Mr. Mohammed transferred another employee to the open position a few days later. *Id.* ¶ 8; Mohammed Decl. ¶ 8. The Court finds no material conflict in the evidence as the distinction is without a difference; the decision to fill the Harmony House position with another employee may have been made immediately, as Mr. Forkwa argues, while the actual transfer occurred days later.

"[A]s soon as [he] got off the phone" with Ms. Glay, Mr. Forkwa called Mr. Mohammed to complain that Ms. Glay had failed to hold the job for him. Forkwa Decl. ¶ 16. Mr. Mohammed said he would look into it but on November 14, 2011, he informed Mr. Forkwa that "there was nothing that he could do to get him a work schedule." *Id.* Mr. Forkwa has not worked for Symbral since October 2011.

### C. Procedural History

Following the events of October and November 2011, Mr. Forkwa filed a complaint with the District of Columbia Office of Human Rights (DCOHR), alleging disparate treatment on the basis of sex and retaliation. Def.'s Reply Ex. 1, DCOHR No Cause Finding Letter (DCOHR Letter) [Dkt. 20-1] at 1. The charge was cross-filed with the Equal Employment Opportunity Commission, alleging a violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e *et seq.* Certain facts as they appear in the DCOHR Letter are different from those presented in the submissions to this Court, and not all arguments made before the DCOHR are made here. DCOHR issued its Letter finding No Cause on September 4, 2014. The DCOHR Letter will be admitted for the limited purposed intended by Symbral, that

is, to show that Mr. Forkwa did not complain that retaliation caused the June 2011 events or mention Mr. Glay's statement that he sympathized with women. The Court will not rely on DCOHR's analysis, but itself analyze the record evidence here.

On November 4, 2015, Mr. Forkwa filed the instant Complaint. After discovery, Symbral filed its Motion for Summary Judgment on February 8, 2017. *See* Def.'s Mot. for Summary Judgment [Dkt. 17] (Def.'s MSJ). Now represented by counsel, Mr. Forkwa opposed, *see* Pl.'s Opp'n, and Symbral replied, *see* Def.'s Reply [Dkt. 20]. Mr. Forkwa also filed a Supplemental Memorandum soon after filing his Opposition, *see* [Dkt. 19], and Symbral submitted substitute declarations for Messrs. Mohammed and Larose, which simply added signatures and dates. *See* Supplemental Declarations [Dkt. 24]. The Court held oral argument on July 11, 2017, following which Mr. Forkwa submitted supplemental citations in response to questions posed by the Court at the argument. *See* Notice of Supplemental Citations [Dkt. 25]. The matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Symbral moves for summary judgment. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, a court gives the non-movant the benefit of all permissible inferences that may be drawn from the facts alleged in the complaint, and accepts the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255; *Talavera*, 638 F.3d at 308. A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

### III. ANALYSIS

Mr. Forkwa alleges sex discrimination leading to disparate treatment between him and his female colleagues and/or Ms. Mbanwi in violation of Title VII. *See* Compl. Count I. He also alleges retaliation based on protected activity, in violation of Title VII. *See* Compl. Count II.[7]

#### A. Disparate Treatment under Title VII

As amended by the Equal Employment Opportunity Act of 1972, Title VII prohibits discrimination in the workplace, because of an individual's race, color, sex, religion, or nationality. The "two essential elements of a discrimination claim" under Title VII are "that (1) the plaintiff suffered an adverse employment action (2) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

---

[7] Plaintiff has definitively stated that he is not making any discrimination claim on the basis of race. *See* Opp'n at 1.

In addition, Title VII was amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m), specifically to provide a statutory basis for cases of "mixed-motive" discrimination, albeit with limited remedies. Title VII recognizes a "mixed-motive" theory of violation in which an employer had both permissible and impermissible reasons for its discriminatory action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013) (discussing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) and the effect of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m)). A mixed motive is one in which the employee's protected class (race, color, sex, etc.) "was *a motivating factor* for [the] employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Under Title VII, therefore, there are both "single-motive" and "mixed-motive" theories of discrimination. *See Fogg v. Gonzales*, 492 F.3d 447, 451 (D.C. Cir. 2007).

If a plaintiff cannot provide direct evidence of discrimination, courts apply the burden-shifting framework established long ago in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), by which the burden of production shifts. As described by the Supreme Court, the *McDonnell Douglas* framework applies as follows: A plaintiff must first make out a prima facie case (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Id.*; *see Youssef v. FBI,* 687 F.3d 397, 401-02 (D.C. Cir. 2012). The burden then shifts to the defendant, which must "articulate some legitimate, nondiscriminatory reason" for its action. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). If the defendant does so, the plaintiff must show by a preponderance of the evidence that the reason advanced by the employer was merely a pretext to hide discrimination. *Id.* If a jury does not credit the employer's permissible motive and finds that the real reason for its action was illegal

discrimination, the employee has proved his case and is entitled to a full award of damages, including backpay, reinstatement, compensatory damages, attorney fees, and the like.  If, however, the jury credits both parties and finds that the employer had a mixed motive—it discriminated against the plaintiff but also that it had a legitimate non-discriminatory reason for its action—the Civil Rights Act of 1991 limits the plaintiff's recovery to a declaratory judgment of discrimination and attorney fees and costs, but no backpay, compensatory damages or reinstatement.  *Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008).

To prove a claim of disparate treatment, a plaintiff must first show that he suffered an adverse employment action; and, as relevant here, that the adverse employment action was based on his sex.  An "adverse employment action" is an established legal term meaning "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  "[N]ot everything that makes an employee unhappy is an actionable adverse action."  *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).  An employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (distinguishing between non-actionable "purely subjective injuries" and actionable "objectively tangible harm").  An actionable adverse action "in most cases inflicts direct economic harm."  *Burlington Indus.*, 524 U.S. at 762.

"If a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)). Direct evidence of discrimination may entitle a plaintiff to a jury trial irrespective of the employer's defense. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (holding that use of a racially-charged comment "alone is direct evidence that in this case [the plaintiff] is entitled to a jury trial").

### B. Mr. Forkwa's Sex Discrimination Allegations

Mr. Forkwa asserts first that he was subjected to sex discrimination when he was placed on unpaid leave following the death of the Benjee House resident while female counselors, including Ms. Mbanwi, were permitted to work. In so doing, Mr. Forkwa asserts a rare case of sex discrimination in which the alleged discriminators—Messrs. Glay and Larose— are of the same sex as he. Such a case is often an uphill climb. *See Glass v. Lahood*, 786 F. Supp. 2d 189, 216 (D.D.C. 2011) (stating that when a plaintiff's alleged discriminators belong to the same protected class, this "weighs against an inference of discrimination").

Mr. Forkwa argues that Mr. Glay's comment that Mr. Glay "sympathizes with women" constitutes direct evidence of discrimination and he is, therefore, not obligated to satisfy the *McDonnell Douglas* test of shifting burdens. *See* Opp'n at 12-13. The statement, denied by Mr. Glay, is shorn of its context in Mr. Forkwa's re-telling, making its precise meaning unclear, since it could be benign. Its value as direct evidence of sex discrimination is further undercut by Mr. Forkwa's admission that Mr. Glay also said that he "sympathize[s] with [Mr. Forkwa]." Forkwa Dep. at 113:21-114:5

Additionally, Mr. Glay put both Mr. Forkwa and Ms. Mbanwi in LWOP status on May 27, 2011. Ms. Mbanwi is Mr. Forkwa's only true comparator, as both were the only ones who had cared for the deceased resident just before his death. It was Mr. Larose, Mr. Glay's supervisor, who conditionally reinstated Ms. Mbanwi on June 6, and Mr. Forkwa makes no allegation that Mr. Larose either made any statement similar to Mr. Glay, or was influenced by Mr. Glay's thinking at the relevant time. Mr. Forkwa's testimony about Mr. Glay's comment may be evidence of discrimination by Mr. Glay, not Mr. Larose, but it is not enough on its own to make out a direct case of discrimination sufficient to override the usual burden-shifting analyses.

Thus, the Court turns to the *McDonnell Douglas* test. "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jackson v. Gonzales*, 496 F.3d 703, 706 (D.C. Cir. 2007). When an employer "has asserted legitimate, non-discriminatory reasons for" the challenged action, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sgt. at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008). "[T]he district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ?" *Id.*

Mr. Forkwa argues that he suffered two adverse actions: (1) Symbral placing him on LWOP and leaving him in that status despite reinstating Ms. Mbanwi; and (2) Symbral giving him a disciplinary notice on June 22, which turned his entire period of LWOP (May 27 to June

13

22) into a suspension. *See* Opp'n at 12. Symbral asserts that Mr. Glay placed both Mr. Forkwa and Ms. Mbanwi on LWOP pending an investigation into the death of A.M., a resident client of Benjee House. This assertion is not contested by Mr. Forkwa, although he appears to have believed initially that *all* counselors were placed on LWOP, *see* Forkwa Dep. 89:11-22, when it was only him and Ms. Mbanwi. Symbral further asserts that any delay in reinstating Mr. Forkwa was due to the busy conflicting schedules of the parties involved. *See* Def.'s Reply at 10-11. It points to the fact that Mr. Forkwa was substitute teaching in early June, and Messrs. Larose and Glay were attending to the deceased resident's family, an investigation of the death by the District of Columbia Metropolitan Police Department, and Symbral's own internal investigation, in addition to overseeing care for Symbral's residents. *Id*.

The Court finds that Mr. Forkwa's alleged two acts of discrimination actually constitute a single financial wrong sufficient to constitute an adverse action: whether he was left in LWOP status or suspended for that period in the after-the-fact disciplinary notice, Mr. Forkwa suffered a single adversity, that is, the loss of pay for the relevant period.

Symbral's explanation that its supervisors and Mr. Forkwa had conflicting schedules in early June, and therefore could not meet, is not contested by Mr. Forkwa, who does not dispute his work records as a substitute teacher at MCPS. The burden shifts to Mr. Forkwa to provide evidence from which a reasonable jury could find that Symbral's non-discriminatory reasons were a pretext to hide sex discrimination. This he fails to do. Mr. Forkwa does not dispute that a client resident died and that necessary investigations were conducted. He also acknowledges that he was contacted about June 13, 2011, and asked for information concerning patient care of the deceased client resident, which he provided to Symbral around June 15. Clearly, the investigation was still ongoing on that date. Despite his confusion about the number

of counselors initially placed on LWOP, Mr. Forkwa does not dispute that only he and Ms. Mbanwi cared for the deceased resident immediately before the resident's death and would potentially have been responsible parties had some error been made. Further, Mr. Forkwa does not dispute that Mr. Larose terminated Ms. Mbanwi on June 22, the same day that Mr. Glay reinstated Mr. Forkwa, at the end of Symbral's internal investigation.

However, Mr. Forkwa argues that Symbral has provided no additional reasons for the delay in returning him to work beyond scheduling difficulties, as to which he expresses his doubts. *See* Opp'n at 16-17 ("[O]ther than inconvenience, being 'busy' or 'scheduling,' Defendants do not offer a legitimate reason for why it took them almost a month to contact Plaintiff about Mbanwi's various admissions [that she had refused the offer of Mr. Forkwa's key]."). Mr. Forkwa says that he tried to meet with Mr. Glay or Mr. Larose when Mr. Forkwa went to the office unannounced more than once during June, although he "cannot remember the specific dates." Forkwa Dep. 118:8-9. Mr. Forkwa adds that when he did go to the office, the "supervisor[s were] not even in the office" because "they only come when they . . . don't have any activity to do in the houses." *Id.* 118:10-11; 15-17. Not only does this testimony not support Mr. Forkwa's argument that Symbral's scheduling difficulty was mere pretext, but it actually lends some support to Symbral's explanation that both supervisors were busy dealing with the aftermath of the resident's death.

The greatest weakness in Mr. Forkwa's argument is his insistence that the entire matter of his placement on LWOP concerned solely the question of whether he had offered his key to the medication cabinet to Ms. Mbanwi. He argues, "[w]hat's more, is that Symbral had communications with Forkwa on June 15, 2011, regarding the incident at the Benj[ee] House. Symbral could have indicated to him that he did nothing wrong and could resume work . . . ."

Opp'n at 17.  He adds that "all of Symbral's officers still *knew* that Forkwa had not committed

any wrongdoings for almost an entire month and was still not allowed to return to work."  *Id.* at

16.  Contrary to this explanation, the undisputed facts reveal a much greater set of circumstances

arising from the patient's unexpected death, including external police and internal Symbral

investigations.  Mr. Forkwa does not contest or even address these facts.

Mr. Forkwa has not provided evidence from which a jury could reasonably find

that Symbral's proffered reasons for placing him on LWOP on June 6 and not reinstating him

until June 22 were mere pretexts to conceal sex discrimination.  He and Ms. Mbanwi were

obvious subjects of investigation after the unexpected death, as the immediate caregivers to the

deceased resident, and Mr. Forkwa does not overcome Symbral's legitimate nondiscriminatory

reason for the timing of his return to work.  In the face of the uncontested facts in the record, the

barren statement that Mr. Glay "sympathizes with women" does not carry the weight Mr. Forkwa

would give it.

Finally, Mr. Forkwa challenges the disciplinary notice he received on June 22,

although he appears to limit his argument to the fact that it was issued to him later than Symbral

policies allowed.  *See* Opp'n at 18.  The evidence shows that Ms. Mbanwi's and Mr. Forkwa's

disciplinary notices have the same date and that each was delivered on that date.  *See* Mbanwi

Disciplinary Notice [Dkt. 17-5]; Forkwa Disciplinary Notice [Dkt. 18-4].  There is no evidence

to support the allegation that any delay in issuing Mr. Forkwa's disciplinary notice was due to

sex discrimination, rather than the ongoing investigations.  The notice itself listed non-

discriminatory, work-related reasons for his suspension.  Responding to the discipline notice in

his written statement, Mr. Forkwa said only that he "disagreed."  Mr. Forkwa's disagreement

with Symbral's reasons for discipline does not connect his suspension to his sex, particularly

since Ms. Mbanwi suffered discharge. An employer may err when it disciplines an employee, but an error, without more, does not constitute discrimination. *See Diggs v. Potter*, 700 F. Supp. 2d 20, 48-49 (D.D.C. 2010) ("The question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason.").

Mr. Forkwa has failed to provide evidentiary support for his allegation that he was disciplined on June 22 due to sex discrimination and not due to Symbral's belief that he had violated specified requirements of his job. The Court will grant summary judgment to Symbral on Count I.[8]

### C. Retaliation Under Title VII

To prove retaliation for protected EEO activities under Title VII, an employee must establish three elements: that (1) he made a charge or opposed a practice made unlawful by Title VII; (2) the employer took a materially adverse action against him; and (3) the employer acted "because of" his protected conduct. *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (citing *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)). Once a plaintiff shows a prima facie case of retaliation, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *see Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) ("A Title VII plaintiff [asserting unlawful retaliation]

---

[8] The Court notes that Mr. Forkwa did not charge Symbral with retaliation in connection with the June events in his original EEOC administrative complaint. *See* Forkwa Charge of Discrimination [Dkt. 17-12]. Even if such an allegation were to be considered, it is without merit. The claim in Mr. Forkwa's Opposition that he was retaliated against in June, either when he was placed or left on LWOP *or* when he was disciplined, Opp'n at 12, fails to overcome Symbral's legitimate non-discriminatory reasons for its actions due to a complete lack of evidence (by direct evidence or inference) that would tie any of the acts to retaliatory animus.

may raise a preliminary, circumstantial inference of prohibited motive through the burden-shifting framework of *McDonnell Douglas Corp*.").

Retaliatory conduct need not reach the same level of adversity as discriminatory conduct to be actionable. *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1165-66 (D.C. Cir. 2010) (citing *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 60-61 (2006)). "Title VII's substantive [discrimination] provision and its anti-retaliation provision are not coterminous" because the "scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008) (quoting *Burlington N.*, 548 U.S. at 67). Retaliatory conduct must be material enough to "dissuade . . . a reasonable worker from making or supporting a charge of discrimination." *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington N.*, 548 U.S. at 68). However, material adversity requires "more than 'those petty slights or minor annoyances that often take place at work and that all employees experience,'" because the EEO statutes are not general laws of civil behavior in the workplace. *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Burlington N.*, 548 U.S. at 68).

Additionally in contrast to discrimination claims, an employee must prove a retaliation claim according to traditional principles of but-for causation. *Univ. of Tex. SW Med. Ctr.*, 133 S. Ct. at 2534 (holding that "a plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"). There is no "mixed-motive" retaliation.

### D. Mr. Forkwa's Retaliation Claims

Mr. Forkwa asserts that he was subject to retaliation in October 2011 due to his complaint of sex discrimination. He contends that Mr. Larose retaliated against him by

effectively terminating him on October 28, 2011 after Mr. Forkwa was thought to have left a mandatory training session early. Opp'n at 23. Mr. Forkwa's theory is that, after the events of June 2011, Mr. Larose and Mr. Glay harbored a "desire to 'get back at' Forkwa for his exercise of a protected right," and therefore, "[i]n order to just terminate [Mr. Forkwa], Larose introduced . . . the subsequent theory that Forkwa left the training early." *Id*. As this argument goes, Mr. Larose and Mr. Glay "apparently sought to get back at" Mr. Forkwa, and so concocted a spurious story that Mr. Forkwa had left training early in order to fire him, all in retaliation for his sex discrimination complaints four months earlier. *Id.* Mr. Forkwa contends that Mr. Larose "effectively" terminated him and Mr. Muhammed merely "confirmed" the termination. *Id.* He argues that Symbral's explanation that Mr. Mohammed sustained Mr. Forkwa's discharge because Mr. Mohammed had learned that Mr. Forkwa failed to show up for training at Harmony House "is unfounded or untrue because Forkwa had already been terminated before any purported transfer by Symbral." *Id*.

The Court begins its analysis with the allegation that Messrs. Larose and Glay "introduced" a story that Mr. Forkwa left the training session early in October in order to manufacture a reason to terminate him for his June complaints of sex discrimination. *Id.* The events surrounding the training occurred in October 2011, approximately four months after Mr. Forkwa's June 2011 EEO complaints. "When relying on temporal proximity alone to demonstrate causation, there is no bright-line rule, although three months is perceived as approaching the outer limit." *Greer v. Bd. of Trs. of the Univ. of the District of Columbia*, 113 F. Supp. 3d 297, 311 (D.D.C. 2015). A four-month gap between complaint and alleged retaliation is usually too lengthy to infer causation between the two, especially when there is no intervening evidence of illegal intention. Obviously, causation may be proved with evidence beyond mere

temporal proximity, *see Kilpatrick v. Riley*, 98 F. Supp. 2d 9, 23 n.19 (D.D.C. 2000), but there is no such evidence here and Mr. Forkwa relies only on a temporal inference of causation, which is too weak as a matter of law to prove that October events were caused by those in June.

The evidence also shows that Mr. Forkwa was disciplined in July 2011; he received a written warning for failure to complete his time sheets. *See* Opp'n Ex. 4, Forkwa Disciplinary Notice [Dkt. 18-4] at 3. If his supervisors wanted to retaliate for Mr. Forkwa's protected conduct in June 2011, this July discipline might have allowed it. The fact that no termination occurred in July further weakens an inference of causation between the complaints in June and the termination in October 2011.

In the alternative, Mr. Forkwa argues that he need show no connection between June and October because he renewed his complaint of sex discrimination when meeting with Mr. Larose on the day after the training session, at which meeting Mr. Larose instructed Mr. Forkwa not to report for work. Forkwa Decl. ¶ 11. Although denied by Symbral, the Court accepts that Mr. Forkwa made such a complaint, as is required in this procedural posture. *See Greene v. Dalton*, 164 F.3d at 674 ("In deciding whether there is a genuine issue of fact before it, the court must assume the truth of all statements proffered by the party opposing summary judgment."). Thus, the Court will credit Mr. Forkwa's sworn statement that he complained of sex discrimination at the meeting with Mr. Larose about the training session and finds that such a complaint could have a causal connection to Mr. Forkwa's discharge.

Symbral offers the legitimate non-discriminatory reason for discharge that Mr. Forkwa was separated because he failed to report for training after his transfer to Harmony House. Affidavits from Mr. Mohammed; Paula Freeman, Mr. Mohammed's secretary; and Mr. Forkwa attest that Mr. Forkwa was informed of his transfer, and received specific information

about the transfer after he called Ms. Freeman.  The Symbral affidavits add that Mr. Forkwa

spoke with Mrs. Glay, who scheduled orientation for Mr. Forkwa but that he failed to appear

despite getting specific directions after he called about being lost.  *See* Mohammed Decl. ¶¶ 6-7;

Freeman Decl. [Dkt. 17-11] ¶¶ 3-5; Edith Glay Decl. ¶¶ 4-8.  Mr. Forkwa's version of events is

that, despite calling her, he could not reach Ms. Glay for several days and, when he did, she told

him the job was filled by another employee.  Forkwa Decl. ¶ 15.

 Symbral employees clearly viewed Mr. Mohammad as the final decisionmaker on

personnel matters:  Ms. Mbanwi appealed her termination by Mr. Larose and obtained

reinstatement by Mr. Mohammed; Mr. Forkwa himself appealed his October termination by Mr.

Larose and obtained a transfer to Harmony House from Mr. Mohammad; and, consistent with

this pattern, it was Mr. Mohammad who decided he could do nothing further once Ms. Glay

reported that Mr. Forkwa had failed to report for training.  In all relevant instances, including Mr.

Forkwa's transfer and subsequent separation, Mr. Mohammad made the final decision.

 The parties vigorously contest when various Symbral employees learned of the

pending transfer from Mr. Mohammad and when Mr. Forkwa was himself informed.[9]  The Court

accepts Mr. Forkwa's version of events as he is the non-movant.  Nonetheless, it does not satisfy

his burden as plaintiff.  The issue of whether Mr. Mohammad decided to transfer Mr. Forkwa

days before informing Mr. Forkwa, or whether Mr. Mohammad informed Mr. Larose or Mr.

Glay before Mr. Forkwa, or even whether Mr. Mohammad had spoken to Mr. Forkwa without

telling him that he intended to transfer Mr. Forkwa, is ultimately irrelevant.  Employers are

---

[9] In its Reply, Symbral moves to strike a portion of Mr. Forkwa's sworn affidavit that he spoke with Mr. Glay during this period on the grounds that it conflicts with his deposition testimony. Mr. Forkwa admitted in deposition that his recollection of some of dates and times "may not be accurate."  Forkwa Dep. 158:6-8.  Because it is unnecessary to resolve the summary judgment motion, the Court declines to strike this portion of Mr. Forkwa's statement.

entitled to make legitimate employment decisions as they see fit as long as they do not discriminate.

Notably, Mr. Forkwa does not allege that Mr. Mohammad retaliated against Mr. Forkwa, or was otherwise driven by discriminatory animus towards Mr. Forkwa. In contrast, Mr. Forkwa seems to have a high opinion of Mr. Mohammad, stating that:

> [W]hen I found out [the position had been filled] I called Mr. Mohammad and told him that the lady, Mrs. Glay, has said somebody was already sent from the office. He told me that, Mr. Mohammad told me that, well—and I believe him. It's not as if I doubted him. Because I had known him to be a pastor, you know? . . . So I believe what he said, you see? Anything he said, I believe it. It was not as if I doubted him. He told me, Well, there's really—just give me some time again and try to call again. Let me see what is happening.

Forkwa Dep. 102:21-103:10.

With Mr. Forkwa's commendation and lack of challenge to Mr. Mohammad, the reason, the Court accepts Mr. Mohammad's statement that he had heard from Ms. Glay that Mr. Forkwa was a no-show at Harmony House, even though it does not credit, on summary judgment, Ms. Glay's similar, but contested, statement. By choosing to present his termination as imposed by Mr. Larose and only confirmed by Mr. Mohammad, Mr. Forkwa avoids all comment or argument concerning Mr. Mohammad's role, including his agreement to reinstate Mr. Forkwa to a new location. Critically, Mr. Forkwa also omits any challenge to or commentary on Mr. Mohammad's statement that he had heard from Ms. Glay that Mr. Forkwa was a no-show. The uncontested evidence demonstrates that Mr. Mohammad decided to terminate Mr. Forkwa following the alleged miscommunications concerning Mr. Forkwa's transfer to Harmony House and after he had spoken with Mr. Forkwa. Mr. Forkwa does not

allege that this decision by Mr. Mohammad was a pretext to hide retaliation[10] or provide any evidence that might support such an allegation.

*Brady v. Office of the Sergeant at Arms* is instructive in this situation. 520 F.3d 490. In *Brady*, the plaintiff was terminated by his employer's final decisionmaker after that decisionmaker received reports that the plaintiff had sexually harassed other employees. *Id.* at 494. The plaintiff argued that the accusers, all lower-level employees, had fabricated the accusations with racist motivations. *Id.* at 495. The D.C. Circuit rejected the plaintiff's argument because the final decisionmaker had honestly believed that the allegations were genuine. *Id.* "The question is not whether the underlying . . . incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident occurred." *Id.* at 496 (emphasis in original). "Although [the plaintiff] assert[ed] that the accusations and ensuing investigation were racially tainted and the incident did not occur, he did not produce evidence sufficient to show that the [employer's] conclusion was dishonest or unreasonable." *Id.* As the D.C. Circuit writes:

> Employers obviously have to resolve factual disagreements all the time in order to make employment decisions regarding hiring, promotion, discipline, demotion, firing, and the like. In many situations, employers must decide disputes based on credibility assessments, circumstantial evidence, and incomplete information. But [plaintiff's] argument would mean that every employee who is disciplined, demoted, or fired for alleged misconduct could sue for employment discrimination based on race, color, religion, sex, or national origin and—merely by denying the underlying allegation of misconduct—automatically obtain a jury trial. [The plaintiff] cites no support for that proposition, which would wreak havoc on district

---

[10] The parties' arguments focus on Mr. Forkwa's termination as sounding in retaliation, although Mr. Forkwa's Complaint also states that his "constructive discharge . . . was motivated in substantial part by gender discrimination." Compl. ¶ 15. Regardless of whether his termination is characterized as sex discrimination or retaliation, Mr. Forkwa has failed to meet his burden on under *McDonnell Douglas* by failing to provide evidence refuting Symbral's legitimate, non-discriminatory grounds for his termination, for the reasons described herein.

courts' orderly resolution of employment discrimination cases and improperly put employers in a damned-if-you-do, damned-if-you-don't posture when addressing disciplinary issues in the workplace.

*Id.*

The unchallenged facts make several points clear, despite other contested matters: (1) Mr. Mohammad had the final decision-making power concerning employment at Symbral, including Mr. Forkwa's job; (2) Mr. Mohammad made the decision to terminate Mr. Forkwa following the alleged miscommunications involving Mr. Forkwa's transfer to Harmony House; and (3) Mr. Mohammad asserts without contradiction that he believed that Mr. Forkwa had failed to show up for a work orientation at Harmony House. Without evidence to show that Mr. Mohammad's reason for his decision to terminate Mr. Forkwa was a pretext for retaliation, a claim he does not make or prove, Mr. Forkwa cannot meet his burden under *McDonnell Douglas*. Mr. Forkwa's claim that Mr. Larose, not Mr. Mohammad, actually fired Mr. Forkwa, is inconsistent with the uncontested facts and the employees' history of appealing Mr. Larose's discharge decisions to Mr. Mohammed.

The parties disagree about a number of facts in this case and so the Court has relied only on Mr. Forkwa's statements and uncontested facts. It finds that Symbral is entitled to summary judgment on Count II as a matter of uncontested facts and law.

## CONCLUSION

For the reasons stated above, the Court will grant Symbral's Motion for Summary Judgment, entering judgment in Symbral's favor on both counts. Both parties' ancillary motions will be denied. A memorializing order accompanies this Memorandum Opinion.

Date: March 12, 2018

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge